```
            UNITED STATES DISTRICT COURT
               DISTRICT OF MINNESOTA
               Civil No. 08-358(DSD/SRN)
```

Franklin C. Jesse, Edward J.
Kohler, and R. Patrick Maxwell,
in their capacities as
the Shareholder Representative
and attorneys-in-fact
for the former Optionholders
and Warrantholders of Lettieri's, Inc.,

     Plaintiffs,

v.                                              **ORDER**

HSFL Acquisition Company, LLC,

     Defendant.

     Robert R. Weinstine, Esq., Tiffany A. Blofield, Esq., William A. McNab, Esq. and Winthrop & Weinstine, P.A., 225 South Sixth Street, Suite 3500, Minneapolis, MN 55402, counsel for plaintiffs.

     J. Thomas Vitt, Esq., Katie C. Pfeifer, Esq., P. Joshua Hill, Esq. and Dorsey & Whitney, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, counsel for defendant.

     This matter is before the court on plaintiffs' motion for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court denies in part plaintiffs' motion.

**BACKGROUND**

     This dispute arises out of an October 30, 2006, merger agreement ("Agreement") between Lettieri's, Inc. ("Lettieri's") and defendant HSFL Acquisition Company, LLC ("HSFL"). Lettieri's was

a Minnesota corporation that manufactured ready-to-eat breakfast and lunch items for resale. Plaintiffs Franklin C. Jesse, Edward J. Kohler and R. Patrick Maxwell reside in Minnesota and represent Lettieri's former shareholders ("Shareholder Representatives"). HSFL is a Delaware corporation with its principal place of business in South Dakota that prepares food for resale in the convenience food service market.

In late 2005, Lettieri's owners marketed the corporation for sale. On May 11, 2006, HSFL chief executive officer Desmond Hague ("Hague") sent a nonbinding letter of intent to Lettieri's expressing interest in acquiring the company. (McNab Aff. Ex. H.) HSFL began the due diligence process the following day.

On May 31, 2006, HSFL representatives attended a sales meeting at which Lettieri's portrayed ExxonMobil ("Exxon") - one of Lettieri's primary customers - as a "future growth driver" for its business. (Cummings Aff. ¶ 6; Hague Decl. ¶ 5.) On June 26, 2006, HSFL submitted a binding letter of intent to purchase Lettieri's for $26.5 million. (McNab Aff. Ex. K.) According to HSFL, it bid "at a premium" due to Lettieri's ostensibly growing business with Exxon. (Cummings Aff. ¶¶ 7-8.)

The due diligence process continued throughout the summer of 2006. HSFL obtained Lettieri's customer list and key contracts, and learned that Exxon was one of four customers that generated over three-quarters of Lettieri's sales revenue. Lettieri's also

discovered that Exxon's contract was terminable without cause upon thirty days notice. (Hague Dep. at 152, 215.)

On August 29, 2006, Hague spoke with Joe Chiovera ("Chiovera"), Exxon's product development manager, about Lettieri's. Chiovera noted that Lettieri's had won awards, provided a high quality product and had a "very solid business future." (Id. at 184-85.) Chiovera also disclosed problems with Lettieri's order times, production schedule, communication, product shelf life, case pack size and its "nickel and diming" chief financial officer, Merrill Ayers ("Ayers"). (Id. at 179-80, 185, 190, 192, 193; Chiovera Aff. ¶ 18.) According to Hague, these problems were "minor niggles" that were "being resolved" and not "sizable ... material issues." (Hague Dep. at 185, 189, 190, 194.)

Also during the summer of 2006, Lettieri's and Exxon reached a pricing agreement on a new line of pre-made cheeseburgers. Before Exxon placed its first order, Michael Kerby ("Kerby") - an Exxon manager - noticed that Lettieri's had increased the price per cheeseburger from seventy-five cents to over ninety cents. In a September 1, 2006, email, Kerby told Lettieri's not to start the cheeseburger production, stating that the price increase was "ridiculous" and "of questionable ethics," and that this was the second deal in a row with pricing issues. (Pfeifer Decl. Ex. 27.)

3

Two hours later, Greg Dornbach ("Dornbach"), Lettieri's vice president of sales, emailed Joel Bachul ("Bachul"), Lettieri's chief executive officer, that:

> I have been on the phone for two hours trying to hold my ground and cover our mistake. I am having to fly into Washington D.C. [on] Tuesday to smooth this over and save our reputation and face with Kerby. Chiovera told me off the record that [Exxon] is going to walk from Lettieri's on the burgers if we don't honor the price [of seventy-five cents.] I trust him on this threat! I believe our breakfast [project] is also at stake long-term if we don't make this whole. Trust in [Ayers] is shot.

(Id. Ex. 27.) Dornbach stated in a separate email to Ayers before meeting with Kerby that:

> I have credibility issues I am dealing [with]. We will be dead ... if not handled with kid gloves. Wish me luck. I'm not really too excited about telling [Hague] that we lost all the Exxon business if [Exxon] tells me to get lost because they don't think we are honest anymore.

(Id. Ex. 28.)

Kerby and Dornbach resolved the pricing dispute at their September 5, 2006, meeting. (Kerby Dep. at 189-90, 277.) In addition to moving forward with the cheeseburger deal, Kerby and Dornbach finalized plans for a new waffle breakfast sandwich. (Pfeifer Decl. Ex. 9 at 117-18; Kerby Dep. at 278.) According to Kerby and Dornbach, the meeting was "business as usual," the parties engaged in a "successful negotiation," and "no loss of business" resulted. (Pfeifer Decl. Ex. 9 at 118; Kerby Dep. at

4

190, 279.) Lettieri's did not disclose the cheeseburger pricing dispute to HSFL before the merger. (Cummings Aff. ¶ 11; Davis Aff. ¶ 5; Hague Decl. ¶¶ 7-8.)

Lettieri's and HSFL executed the Agreement on October 9, 2006, and closed the transaction on October 30, 2006. The Agreement contained the following warranties:

> [1] Since the most recent financial statements ... there has been no material adverse effect in the business relationship with any customer or supplier.
>
> [2] [Lettieri's] has not received any communication from any customer or supplier ... of any intention to terminate or materially reduce purchases from or supplies to [Lettieri's].

(McNab Aff. Ex. M § 3.22.) The parties also agreed to put $3.25 million of the purchase price into an escrow fund to be released to the Shareholder Representatives on specified dates absent an indemnity claim. (Id. Ex. N §§ 2.22, 5.)

On January 3, 2007, Exxon decided to terminate its contract with HSFL. (Pfeifer Decl. Ex. 22 at 238.) Before notifying HSFL, Kerby drafted a list of eight reasons for its decision, including the September 2006 cheeseburger pricing dispute. (Id. Ex. 35.) On January 10, 2007, Kerby told Hague that the contract was terminated largely because of Exxon's ongoing concerns about Lettieri's ethics. (Id. Ex. 9 at 157, Ex. 37 at 153, Ex. 38 at 274, Exs. 39-40.) Kerby, however, later characterized these problems as "little issues" and "petty in nature," and said that the driving force

behind Exxon's termination of the contract was its desire to hire a new vendor that would provide Exxon a full refund for any unsold product.  (Kerby Dep. at 223, 243-44, 253, 259.)

On October 23, 2007, HSFL demanded indemnification from the Shareholder Representatives, claiming that Exxon terminated the contract due to reasons known to Lettieri's before the merger. Thereafter, the Shareholder Representatives brought an action in state court for a declaratory judgment that they are entitled to the escrow amount.  HSFL timely removed, and on February 18, 2008, filed a counterclaim alleging breach of contract and seeking a declaratory judgment that HSFL is entitled to the escrow funds. The Shareholder Representatives now move for summary judgment on HSFL's breach of contract counterclaim.

## DISCUSSION

### I.  Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of his claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

## II. Breach of Warranty

To prevail on a breach of warranty claim under Minnesota law, a party must show the existence of a warranty, a breach and a causal link between the breach and the alleged harm.[1] See Hendricks v. Callahan, 972 F.2d 190, 193 (8th Cir. 1992) (citing Peterson v. Bendix Home Sys., 318 N.W.2d 50, 52-53 (Minn. 1982)). Furthermore, where a transaction in goods covered by the Uniform Commercial Code is not at issue, a party must also show reliance on the warranty. See Hendricks, 972 F.2d at 195; Alley Constr. Co. v.

---

[1] HSFL argues that Lettieri's nondisclosures breached the Agreement. The court frames HSFL's argument as a breach of warranty claim.

State, 219 N.W.2d 922, 924-25 (Minn. 1974); Midland Loan Fin. Co. v. Madsen, 14 N.W.2d 475, 481 (Minn. 1944). In this case, neither party disputes the existence of the warranties. The Shareholder Representatives argue, however, that HSFL has not established a factual issue as to breach, causation or reliance.

**A.   Breach**

**1.   Intent to Terminate**

HSFL first argues that Dornbach's September 1, 2006, email to Bachul demonstrates that Exxon communicated its intent to terminate or reduce its purchases, and that Lettieri's breached the warranty by failing to disclose this information before the merger. In response, the Shareholder Representatives contend that Dornbach's email merely documented a warning from Exxon that was never acted upon because Dornbach and Kerby settled the pricing dispute within days.

The plain language of the warranty, however, required Lettieri's to disclose "any communication" from a customer of "any intention" to terminate or materially reduce purchases. The warranty contains no requirement that the intent actually result in termination or a reduction. (McNab Aff. Ex. M § 3.22.) See Minneapolis Pub. Hous. Auth. v. Lor, 591 N.W.2d 700, 704 (Minn. 1999) (court construes unambiguous contract terms according to plain and ordinary meaning). Accordingly, Dornbach's email creates

a fact issue as to whether Exxon communicated its intent to terminate its contract if the pricing issue was not resolved.

HSFL further argues that Dornbach's email suggests that Lettieri's received a communication from Exxon that it intended to terminate its business relationship with Lettieri's in January 2007. The record does not support this argument. First, it is undisputed that Exxon and Lettieri's resolved the pricing issue. Second, no evidence indicates that Exxon communicated its intent to terminate in January 2007 to anyone at Lettieri's. Specifically, Chiovera testified that nobody at Exxon "had any communications with [Dornbach] or anyone else at Lettieri's such that Exxon would be moving its business [to another vendor] or cancelling the Lettieri's contract." (Chiovera Aff. ¶ 27.) Furthermore, Dornbach stated that he had "no clue" that Exxon would end the relationship and was "blind-sided" by its decision.

(Dornbach Dep. at 84, 133, 185.) HSFL has no admissible evidence challenging these statements. Therefore, summary judgment is warranted to the extent that HSFL's claim is based on Lettieri's failure to disclose a communication from Exxon that it intended to terminate the contract in January 2007.

**2. Material Adverse Effect**

HSFL next argues that Lettieri's breached the warranty by failing to disclose Exxon's concerns about Lettieri's ethics and the poor shelf life of Lettieri's products. (McNab Aff. Ex. M

9

§ 3.22.)  The Agreement broadly defined "material adverse effect" to include "any change, occurrence or development that is, or could reasonably be expected to be, materially adverse to the business, results, operations, properties, condition (financial or otherwise), assets or liability of [any] person."  (Pfeifer Decl. Ex. 31 § 1.)

HSFL maintains that the cheeseburger pricing dispute caused Exxon to seriously doubt Lettieri's ethics - as demonstrated by Kerby's September 1, 2006, email to Dornbach and Dornbach's subsequent email to Ayers - and that Exxon never regained trust in Lettieri's.  The Shareholder Representatives argue that Exxon's concerns about ethics did not rise to the level of a material adverse effect, noting that Kerby characterized his email as an "overstatement" and that Lettieri's returned to "business as usual" after the September 5, 2006, meeting.  (Chiovera Aff. at ¶ 10; Dornbach Dep. at 65-66, 118; Kerby Dep. at 118, 279.)

The emails reveal Lettieri's knowledge that the cheeseburger pricing dispute caused Exxon to question Lettieri's honesty. Indeed, the record shows that Exxon considered the dispute and its doubts about Lettieri's ethics as reasons to terminate the contract.  Accordingly, considering the facts in a light most favorable to HSFL, the court determines that a reasonable jury could find that Exxon's concerns about Lettieri's ethics were materially adverse to the business and should have been disclosed.

HSFL also argues that Lettieri's failed to disclose its inability to increase the shelf life of its products. According to HSFL, thirty-five to fifty percent of the products supplied by Lettieri's became waste before being sold by Exxon. The Shareholder Representatives acknowledge that the shelf life of Lettieri's products was a problem. HSFL, however, was fully aware of this problem but did not deem it material. On August 29, 2006, Chiovera informed Hague of Exxon's desire to reduce "case pack size" or use "vacuum or modified atmosphere packaging ... to seal and extend the shelf life of the food." (Chiovera Aff. ¶¶ 18-19.) Hague dismissed this issue as a minor problem that was being resolved. (Hague Dep. at 185, 189, 192-93.) Therefore, summary judgment is appropriate to the extent HSFL relies on the poor shelf life of Lettieri's products to support its breach of warranty claim.

**B.   Reliance and Causation**

Lastly, the Shareholder Representatives argue that even if HSFL can prove that a breach of warranty occurred, it cannot show reliance on the warranty or that the breach caused any damages because HSFL knew of Exxon's concerns and deemed them immaterial. Hague, however, testified that the first time he learned of the cheeseburger pricing dispute was on January 10, 2007, and that HSFL relied on Lettieri's warranties when it decided to go ahead with the merger. (Pfeifer Decl. Ex. 38 at 218; Hague Decl. ¶¶ 7-9.)

This testimony creates a fact issue as to whether Lettieri's alleged nondisclosures caused HSFL to pay an inflated purchase price. Therefore, summary judgment on HSFL's counterclaim is not warranted.

## CONCLUSION

Based upon the file, record and proceedings herein, and for the reasons stated, **IT IS HEREBY ORDERED** that plaintiffs' motion for partial summary judgment [Doc. No. 22] is denied in part.

Dated: April 22, 2009

s/David S. Doty
David S. Doty, Judge
United States District Court